IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER REED, | ) | CASE NO. 1:13-cv-02568 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Christopher Reed ("Plaintiff" or "Reed") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 16. As discussed below, the Administrative Law Judge ("ALJ"), contrary to the provisions of SSR 06-03p, did not discuss or even mention the opinions offered by Reed's treating nurse, Nicole E. Leach, RN, CPNP, FNP-BC, which included significantly more restrictive sitting and standing limitations than those found by the ALJ.[1] Accordingly, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this Opinion.

---

[1] Although Reed's treating nurse is not an "acceptable medical source," SSR 06-03p nevertheless requires that "the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources. . . '". SSR 06-03p, 2006 WL 2329939, * 6 (Aug. 9, 2006). See discussion below.

1

## I. Procedural History

On July 19, 2010, Reed filed an application for Disability Insurance Benefits ("DIB") (Tr. 16, 66, 68) and, on August 4, 2010, he filed an application for Supplemental Security Income ("SSI") (Tr. 16, 67, 80). Reed alleged a disability onset date of May 23, 2010. Tr. 68, 80, 168, 180. He alleged disability based on type II diabetes; arthritis in his knees, hands, fingers, and shoulders; high blood pressure; depression; mood swings; gout; and cellulitis. Tr. 68, 80, 122, 126, 131, 134, 185. After initial denial by the state agency (Tr. 122-128), and denial upon reconsideration (Tr. 131-136), Reed requested a hearing (Tr. 137-138). On February 29, 2012, ALJ Edmund Round conducted an administrative hearing. Tr. 32-63.

In his July 24, 2012, decision, the ALJ determined that Reed had not been under a disability from May 23, 2010, through the date of the decision. Tr. 13-31. Reed requested review of the ALJ's decision by the Appeals Council. Tr. 10-12. On September 26, 2013, the Appeals Council denied Reed's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-7.

## II. Evidence[2]

**A.  Personal, educational and vocational evidence**

Reed was born in 1966. Tr. 38, 168. He completed the 11th grade. Tr. 38, 186. He has taken the GED but has not passed it. Tr. 39. Reed was living with his father at the time of the hearing. Tr. 49. He last worked on May 23, 2010, as a cashier at Speedway.[3] Tr. 39. At the time of the hearing, Reed was working 2 hours each day delivering newspapers via a motor

---

[2] Reed's arguments pertain to his physical rather than mental impairments. Accordingly, the evidence summarized herein is generally limited to Reed's physical impairments.

[3] Reed left because he was accused of stealing. Tr. 40. He has denied those allegations. Tr. 340.

route.  Tr. 40.   Reed also worked in the past at a fast food restaurant doing maintenance type work, i.e., emptying garbage and stocking shelves.  Tr. 41.  Reed also worked at a factory cutting and spurring pipe and at Lowe's as a cashier.  Tr. 42, 43.

**B.**     **Medical evidence**

Beginning in 2009, Reed saw medical professionals at Community Health Partners with complaints of intermittent right knee pain and swelling.  Tr. 282.   He first saw Dr. Claudet C. Smith, M.D., on January 23, 2009.  Tr. 282.  During that visit, Reed reported that his knee pain and swelling had been more significant during the prior two months.  Tr. 282.  Reed reported that he had been doing a lot of walking and stood a lot at work.  Tr. 282.  He described his pain as throbbing and warm to the touch.  Tr. 282.  Reed weighed 247 pounds and was 5 feet, 4 ½ inches tall.  Tr. 282.  He reported having lost over 100 pounds.  Tr. 282.  On physical examination, Reed had full range of motion in his left knee.  Tr. 282.  He had a decreased range of motion in his right knee on extension.  Tr. 282.  There was crepitus in his right knee with evidence of a small effusion.  Tr. 282.  There was no tenderness to palpation.  Tr. 282.  Dr. Smith's differential diagnosis included osteoarthritis with effusion versus intermittent gout, more likely than osteoarthritis.  Tr. 282.  Dr. Smith indicated that Reed would be treated conservatively with Motrin and recommended an x-ray.  Tr. 283.  Reed's blood pressure was elevated so Dr. Smith also recommended a follow up blood pressure check in one week.  Tr. 283.   A January 23, 2009, x-ray of Reed's right knee showed degenerative changes, appearing most pronounced at the lateral compartment.  Tr. 290.

Reed saw Dr. Smith approximately one month later on March 2, 2009.  Tr. 281.  Reed's blood pressure was better.  Tr. 281.  Reed reported that he mostly noticed his knee pain after standing on his feet all day at work.  Tr. 281.  Dr. Smith diagnosed hypertension, now under

good control, and ongoing right knee pain. Tr. 281. Dr. Smith recommended that Reed continue with Motrin and his blood pressure medication and follow up in 3 months if needed. Tr. 281.

Reed next sought treatment at Community Health Partners in 2010. Tr. 279-280. He saw Nicole E. Leach, RN, CPNP, FNP-BC, ("Nurse Leach"), on August 31, 2010. Tr. 279. Nurse Leach noted that Reed reported having multiple medical issues for some time but had been without income and therefore had been resistant to seeking medical care. Tr. 279. Reed's primary concern was arthritis in his knees. Tr. 279. Reed reported that he had cortisone shots in the past and was taking Celebrex. Tr. 279. However, he felt his knee pain was getting much worse with the pain being mostly in his right knee. Tr. 279. On physical examination, there was crepitus bilaterally in both knees with more on the right. Tr. 279. Lachman's test was slightly positive on the right knee. Tr. 279. Drawer test was negative. Tr. 279. Nurse Leach noted that there appeared to be a slight bony deformity on the top of the patella area. Tr. 279. There was tenderness to palpation on both sides of the knee as well as behind the knee. Tr. 279. On examination of the left ankle, there appeared to be some erythema, swelling and skin breakdown around the ankle extending on the foot. Tr. 279. Nurse Leach assessed severe osteoarthritis, type II diabetes, hypertension, and cellulitis. Tr. 280. She ordered a new x-ray of both knees for Reed's knee arthritis so he could be referred to an orthopedic surgeon. Tr. 280. She prescribed Keflex for his left ankle and provided him with a blood glucose monitor and testing strips. Tr. 280. She also prescribed blood pressure medication and ordered lab work. Tr. 280.

X-rays were taken on September 1, 2010, showing degenerative changes with joint space effusion in Reed's knees. Tr. 288.

During a November 10, 2010, visit with Nurse Leach, Reed reported taking medications prescribed by Nurse Leach, including Lisinopril/hydrochlorothiazide, Celebrex, and Paxil. Tr.

278.  Reed reported that he did not feel that the Celebrex was helping significantly with his joint pain.  Tr. 278.  He indicated that he had significant pain in both knees and that the pain was extending into his ankles and left elbow.  Tr. 278.  He also reported that his shoulders were sore from time-to-time.  Tr. 278.  He indicated that his joints were not only painful but extremely stiff most of the time.  Tr. 278.  Reed felt that the rash on his left ankle was getting worse.  Tr. 278.  He stated that he was applying for disability and needed a letter indicating he was unable to work due to his arthritis.  Tr. 278.  On physical examination, Nurse Leach noted that Reed was "well-appearing" but moved rather gingerly and was very slow when getting up, sitting down or changing positions.  Tr. 278.  Nurse Leach observed an extreme amount of crepitus in both knees upon straightening his leg.  Tr. 278.  There was no swelling, redness or warmth but there was soreness upon palpation in both knees.  Tr. 278.  Reed's left elbow was also fairly tender upon palpation.  Tr. 278.  Reed's rash on his left ankle was about the size of a baseball with some redness and warmth.  Tr. 278.  There was also some skin breakdown.  Tr. 278.  Nurse Leach's assessments included arthralgia with definite osteoarthritis in the knees.  Tr. 278.  However, she wanted to rule out rheumatoid process.  Tr. 278.  For Reed's joint pain, Nurse Leach kept Reed on Celebrex and added Vicodin for the pain because there was not much else she could do from an anti-inflammatory standpoint.  Tr. 278.  Nurse Leach noted that ideally she wanted to get him to orthopedics once he obtained Medicaid insurance.  Tr. 278.

Reed saw Nurse Leach again on December 22, 2010, because Nurse Leach had received forms in the mail from Ohio Job and Family Services that would be used to determine whether Reed was eligible for basic medical coverage assistance.  Tr. 277.  Reed reported that he was doing fairly well.  Tr. 277.  However, he reported having more headaches and that his joints were still fairly painful.  Tr. 277.  He was having a hard time moving a lot.  Tr. 277.  Nurse Leach

assessed hypertension, osteoarthritis, and depression. Tr. 277. She indicated that she was recommending him for medical services. Tr. 277. She provided him with a new prescription for Lisinopril/hydrochlorothiazide since Reed reported that he had run out of that medication. Tr. 277. She advised Reed to follow up every three months once he had medical insurance. Tr. 277.

In the physical examination section of the December 22, 2010, treatment notes, Nurse Leach stated "Please see the in-depth copy of the physical attached to this note." Tr. 277. Although there is no attachment in the record, Nurse Leach also completed two Ohio Job and Family Services' forms[4] on December 22, 2010.[5] Tr. 344-346.

In the Ohio Job and Family forms, Nurse Leach listed Reed's medical conditions and medications. Tr. 344, 345. She noted that Reed's health status with treatment was stable. Tr. 345. She indicated that Reed would benefit from orthopedic services in order to be evaluated for possible knee replacements in the future. Tr. 345. On physical examination, Nurse Leach indicated that Reed had limited range of motion in most joints, especially in his knees and shoulders. Tr. 345. His strength was decreased bilaterally. Tr. 345. He had a decreased range of motion in his knees. Tr. 345. Neurologically, Reed was within normal limits. Tr. 345.

Also, in the Ohio Job and Family forms, Nurse Leach offered her opinions with respect to Reed's physical functional capacity. Tr. 346. She opined that Reed was limited to standing/walking for 1 hour in an 8-hour workday and limited to standing/walking without interruption for 15 minutes. Tr. 346. She opined that Reed was limited to sitting 30 minutes in an 8-hour workday and limited to sitting without interruption for 10-15 minutes. Tr. 346. With respect to Reed's lifting/carrying ability, Nurse Leach opined that Reed was limited to

---

[4] The two forms were a Medication Dependencies Form (Tr. 344) and a Basic Medical Form (Tr. 345-346).

[5] Plaintiff's counsel submitted the December 22, 2010, Ohio Job and Family Services' Forms to the ALJ on April 9, 2012, prior to the ALJ's July 24, 2012, decision. Tr. 343.

lifting/carrying 5-10 pounds frequently and 11-20 pounds occasionally.  Tr. 346.  She opined that Reed was moderately limited in his reaching ability and extremely limited in his ability to bend.  Tr. 346.  Nurse Leach indicated that, in order for her to evaluate Reed's functional abilities as set forth in the form, Reed had come to her office and performed a series of tests.  Tr. 346.  She also considered Reed's past and present medical history.  Tr. 346.

On June 22, 2011, Dr. Marsha D. Cooper, M.D., conducted a consultative physical evaluation. Tr. 336-342.  Reed reported that he had applied for disability because his job had required him to stand all day and he never had a chance to sit down.  Tr. 340.  Reed indicated that he did not want a job requiring him to stand in one spot all day because his knees start to ache.  Tr. 340.  On physical examination, Dr. Cooper noted that Reed appeared a little anxious.  Tr. 341.  She observed no effusions, redness, heat or gross deformities with respect to Reed's joints/bones.  Tr. 341.  Dr. Cooper observed that Reed had a normal gait and did not require assistive devices.  Tr. 341.  Dr. Cooper's testing generally showed normal strength and normal range of motion.[6]  Tr. 336-339.  Based on her examination, Dr. Cooper opined that Reed was capable of sedentary work.  Tr. 342.  She noted that the x-ray showed moderate osteoarthritis of the right knee.  Tr. 342, 334.[7]  Therefore, she opined that a job requiring Reed to stand all day may be difficult.  Tr. 342.  She opined that Reed could sit without restriction; his manual dexterity was good; and his intellect was normal.  Tr. 342.

After the hearing but prior to the ALJ's decision, on March 12, 2012, Reed saw Nurse Leach for a physical.[8]  Tr. 348.  Reed reported that he had not been able to fill prescriptions due

---

[6] There was a slight deviation from normal reported with respect to Reed's dorsolumbar spine flexion.  Tr. 338 (Normals = 90; test = 80).

[7] A right knee x-ray was taken on June 22, 2011.  Tr. 334.

[8] Plaintiff's counsel submitted the March 12, 2012, treatment notes to the ALJ on April 9, 2012, prior to the ALJ's July 24, 2012, decision.  Tr. 347.

to a lack of insurance. Tr. 348. He was trying to obtain disability and needed a physical. Tr. 348. Reed indicated that the redness and skin discoloration on the lower part of his left leg had worsened since he last saw Nurse Leach. Tr. 348. On physical examination, Nurse Leach observed severe crepitus and overall tenderness in his knees. Tr. 348. Nurse Leach also noted that Reed had a limp with his gait. Tr. 348. Nurse Leach ordered various labs and tests and advised that Reed should follow up after the various labs and testing were performed. Tr. 349-350.

C. Testimonial evidence

1. Plaintiff's testimony

Reed appeared with counsel and testified at the administrative hearing. Tr. 38-52. Reed discussed his newspaper delivery job indicating that he was mostly in the car but out of the car five or six times to deliver a newspaper to a house, walking approximately 50-100 feet. Tr. 40-41. On heavy days, the newspapers weigh about 40 pounds. Tr. 46. When lifting that amount of weight, he shifts all of his weight to his left-side. Tr. 46. It is difficult for Reed to lift with his right hand because of his carpal tunnel[9] and he has trigger finger in his thumb. Tr. 47.

Reed testified regarding his treatment with Nurse Leach. Tr. 43-44. He indicated that Nurse Leach treated him for high blood pressure, hypertension, diabetes and his knees. Tr. 44. Nurse Leach prescribed him medication for his high blood pressure, hypertension, diabetes and knee. Tr. 44. Nurse Leach treated him as a favor to his sister because of his inability to pay for medical services. Tr. 44. Reed indicated that his last appointment with Nurse Leach had been in December 2010. Tr. 45. However, he stopped seeing her because he could not pay her for the services. Tr. 44.

---

[9] Reed reported having carpal tunnel surgery in 1993. Tr. 47.

Reed takes Vicodin for his knee pain. Tr. 44. He also takes Aleve. Tr. 46. His knees swell and the swelling is really bad during cold or rainy weather. Tr. 45. To get some relief for his knee pain, he rubs his knees a little bit. Tr. 46. His knee pain is worse now than when he was working at Speedway. Tr. 45. When working in the past, he was on his feet. Tr. 45. He has flat feet so being on his feet hurt a lot when he worked but he fought through the pain because he needed a job. Tr. 45. Walking distances or sitting for a while causes his knees to bother him, with shooting pain through his knees. Tr. 45. If he is sitting, he has to get up and walk around. Tr. 45, 50. He can sit for no more than 20 minutes before having to stand up and he can stand for about 20 minutes and then he has to sit or his knee will stay stiff and will not bend. Tr. 46, 50. He can walk about 100 feet before needing to stop and rest. Tr. 46. He has to rest about 15 minutes before feeling like he can walk again. Tr. 46. It took him about 30 minutes to drive to the hearing. Tr. 51. He had to park far away and had to stop a couple of times on his walk. Tr. 51. He left home early to leave enough time to get to the hearing. Tr. 51.

At times, Reed will just start crying and thinks that his life is not worth living because of his pain. Tr. 47-48. Other than being prescribed Paxil by Nurse Leach, Reed has not been treated for depression. Tr. 47. He indicated that he was pretty good at completing tasks unless he has the shooting pain in his knees. Tr. 48. When he is experiencing the shooting pain, he loses his concentration and has to start tasks over. Tr. 48.

Reed has good and bad days. Tr. 48. On a good day, he can get up and do things such as sweep and dust but still sits down to rest during chores because he cannot stand long enough to finish chores at one time. Tr. 48, 49. On bad days, he just lies in bed because it hurts so much to move his knees. Tr. 48. His father or sister usually does the grocery shopping. Tr. 49. If Reed does go grocery shopping, he is usually in and out in 30 minutes. Tr. 49. He walks and pushes a

cart.  Tr. 49.  He leans on the cart for support.  Tr. 49.  His sister takes care of paying Reed's bills.  Tr. 49-50.  He usually sees his sister once on the weekend.  Tr. 50.

At the close of the hearing, the ALJ stated that he had determined that another psychological evaluation was advisable and informed Reed that he would need to appear for another psychological evaluation.  Tr. 62-63.

### 2. Vocational expert's testimony

Vocational expert Brett Salkin ("VE") testified at the hearing.  Tr. 52-62.  The VE described Reed's past work experience.[10]  Tr. 53-55.  The ALJ asked the VE to assume a hypothetical individual of Reed's age and education with no relevant vocational training who is limited to a range of sedentary work, meaning that the individual could stand or walk for 2 hours, sit for 6 hours during an 8-hour day, and lift, carry, push or pull a maximum of 10 pounds, all with commercially normal breaks; precluded from using ladders, ropes and scaffolds; precluded from kneeling, crouching and crawling; precluded from exposure to vibration; precluded from exposure to workplace hazards, such as unprotected heights and unprotected moving machinery; can occasionally use foot controls, bilaterally; and limited to no more than superficial interaction with supervisors, co-workers and the public.  Tr. 55-56.  The VE indicated that the described individual would be unable to perform Reed's past relevant work.  Tr. 57.  However, the VE indicated that there were jobs in national or regional economy that the described individual could perform, including (1) food and beverage order clerk, a sedentary, unskilled job with 800 positions available regionally, 4,500 statewide, and 124,000 nationwide; (2) final assembler (of small parts), a sedentary, unskilled job with 700 positions available regionally, 5,700 statewide, and 110,000 nationwide; and (3) charge account clerk, a sedentary, unskilled job with 900

---

[10] The ALJ excluded Reed's newspaper delivery work as past relevant work based on the minimal number of hours, i.e., 10 hours per week.  Tr. 56-57.

positions available regionally, 4,400 statewide, and 120,000 nationwide. Tr. 57-59. In response to questions from Reed's counsel, the VE indicated that, although there was no bright line standard for allowing an individual to change positions or stand up while performing work, he believed that the positions listed would permit an individual to continue to work while changing positions or standing up. Tr. 61. The VE also indicated that, if an individual was off task 15% of the time because pain was distracting the individual, there would be no jobs available to that individual. Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a

      severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[11] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[12] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his July 24, 2012, decision, the ALJ made the following findings:[13]

1. Reed met the insured status requirements through December 31, 2014. Tr. 18.

2. Reed had not engaged in substantial gainful activity since May 23, 2010, the alleged onset date. Tr. 18. Reed had worked after his alleged disability onset date delivering newspapers but the work activity did not rise to the level of substantial gainful activity. Tr. 18.

---

[11] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 416.925.

[12] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[13] The ALJ's findings are summarized herein.

3. Reed had the following severe impairments: osteoarthritis of both knees, obesity, an adjustment disorder, and a personality disorder. Tr. 18. Reed had non-severe impairments of: hypertension, type II diabetes mellitus, and a remote history of bilateral carpal tunnel surgery. Tr. 19.

4. Reed did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 19-22.

5. Reed retained the RFC to do a range of sedentary work being able to lift, carry, push and/or pull a maximum of 10 pounds; stand and/or walk for 2 hours; sit for 6 hours in an 8-hour workday with normal breaks; precluded from using ladders, ropes and scaffolds; could occasionally use stairs and ramps; precluded from kneeling, crouching, and crawling; precluded from exposure to vibrations and to workplace hazards (such as unprotected heights and unprotected moving machinery); limited to occasional use of foot controls bilaterally; and limited to no more than superficial interaction with supervisors, coworkers, and the public. Tr. 22-25.

6. Reed was unable to perform any past relevant work. Tr. 25-26.

7. Reed was born in 1966, and was 44 years old, defined as a younger individual age 18-44, on the alleged disability onset date, and 46 years old, defined as a younger individual age 45-49, as of the date of the decision. Tr. 26.

8. Reed had limited education and was able to communicate in English. Tr. 26.

9. Transferability of job skills was not material to the determination of disability. Tr. 26.

10. Considering Reed's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Reed could perform, including order clerk (food and beverage), final assembler (small products), and charge account clerk. Tr. 26-27.

Based on the foregoing, the ALJ determined that Reed had not been under a disability from May 23, 2010, through the date of the decision. Tr. 27.

### V. Parties' Arguments

Reed argues that reversal and remand is required because the ALJ failed to mention or evaluate the medical opinions of Nurse Leach, one of Reed's treating medical professionals. Doc. 17, pp. 14-17, Doc. 19, pp. 1-5.  In response, the Commissioner contends that Nurse Leach's opinions were not supported by her own treatment notes or other evidence of record and her opinions did not undermine the ALJ's decision that Reed had the RFC to perform a limited range of sedentary work.  Doc. 18, pp. 10-14.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in

evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"An ALJ is bound to adhere to certain governing standards when assessing the medical evidence in support of a disability claim." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014) (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 545 (6th Cir.2004)). "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings." *Id.* (citing 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513).

Here, the ALJ did not consider or evaluate Nurse Leach's December 22, 2010, opinions. When explaining his reasons for providing great weight to Dr. Cooper's opinion, the ALJ cited, by reference to exhibit numbers only, Nurse Leach's August 31, 2010, and November 10, 2010, treatment notes (Exhibit 2F and 4F) in support of his finding that, although Reed had been prescribed Celebrex and Vicodin for inflammation and pain from his osteoarthritis, the record did not indicate that Reed performed home exercises to improve his lower extremities.  Tr. 23. The ALJ did not mention Nurse Leach at all nor did he discuss or evaluate her December 22, 2010, opinions regarding Reed's functional capacity.  Alternatively, if the ALJ did consider all of the evidence, including the evidence from Nurse Leach, his opinion does not allow this Court to follow his reasons for discounting the opinions and findings made by Nurse Leach.

The Commissioner argues that reversal and remand is not warranted because Nurse Leach's opinions did not undermine the ALJ's decision and/or her opinions were not supported by her own treatment notes or other evidence of record.  However, since the arguments offered by the Commissioner for rejecting Nurse Leach's opinions were not included as part of the ALJ's reasoning, the Commissioner's arguments amount to improper *post hoc* rationalization.

15

*See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App. 181, 192 (6th Cir. 2009) (a reviewing court must assess the propriety of the administrative agency's action on the grounds invoked by the agency) (citing *SEC v. Cherney Corp.*, 332 U.S. 194, 196 (1947)).

Moreover, even though a medical professional may not qualify as "an acceptable medical source" under the regulations, an ALJ must still consider all relevant evidence in the case record. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2013) (citing Soc. Sec. Rul. No. 06-03p, 2006 WL 2329939).  Social Security Ruling 06-03p - *Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, 2006 WL 2329939 (Aug. 9, 2006) provides that:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' [and] [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id. at* * 6.

Here, although Nurse Leach is not an "acceptable medical source," the evidence relating to her treatment of Reed and her opinions regarding Reed's functional limitations was relevant and therefore the ALJ was required to consider the evidence.  Further, Nurse Leach's opinions contained more restrictive sitting and standing limitations than found by the ALJ and, if given weight, may have had an impact on the outcome.  For example, Nurse Leach opined that Reed was limited to standing/walking 1 hour in an 8-hour workday (Tr. 346) whereas the RFC said Reed could stand/walk for 2 hours in an 8-hour workday (Tr. 22).  With respect to Reed's sitting

ability, Nurse Leach opined that Reed was limited to sitting for 30 minutes in an 8-hour workday and for no more than 10-15 minutes at a time (Tr. 346) whereas the RFC said Reed could sit for 6 hours in an 8-hour workday (Tr. 22). In light of the foregoing, pursuant to SSR 06-03p, the ALJ should have generally explained the weight given to Nurse Leach's opinions.

The Commissioner contends that, notwithstanding Nurse Leach's opinions and the ALJ's failure to discuss those opinions, the ALJ's decision is supported by substantial evidence and therefore reversal and remand is not necessary. However, the ALJ's failure to discuss or explain the weight provided to Nurse Leach's opinions is contrary to SSR 06-03p. Thus, the Court is unable to conduct a meaningful review of the decision. Further, "[a]n ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Gentry*, 741 F.3d at 722 (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

### VII. Conclusion

For the reasons set forth herein, the Court **REVERSES AND REMANDS** the Commissioner's decision.[14]

Dated: February 6, 2015

Kathleen B. Burke
United States Magistrate Judge

---

[14] This Opinion should not be construed as requiring a determination on remand that Reed is in fact disabled.